UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 11T Partners, LLC,<br><br>                    Plaintiff,<br><br>- against -<br><br>CritiTech, Inc.,<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff 11T Partners, LLC ("11T Partners" or "11T"), by and through counsel of record, for its complaint against defendant CritiTech, Inc. ("CritiTech"), states and alleges the following:

## NATURE OF THE ACTION

1. This action arises out of a binding written agreement between 11T Partners and CritiTech, pursuant to which 11T Partners agreed to provide CritiTech with financial advice and investment banking services in connection with the disposition of a certain business/asset: specifically, a pharmaceutical called: Nanotax®.

2. This action seeks damages and interest, as well as costs and reasonable attorneys fees, based upon CritiTech's breach of its contract with 11T Partners. Under the contract's explicit and unambiguous terms, 11T Partners was to receive at least a minimum fee upon the closing of any transaction plus an additional fee, based upon various percentages of the aggregate consideration CritiTech and/or its stockholders received in connection with the disposition of Nanotax® and/or the business associated with it. These fees were due and owed upon the transaction's closing, which, on information and belief, occurred on June 15, 2015. To date, however, CritiTech has failed and refuses to pay 11T Partners any fees associated with the Nanotax® transaction.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity between the parties and the matter in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars ($75,000.00).

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and because the contract between the parties specifies that the applicable law is New York State and jurisdiction lies with the District Court of the Southern District of New York.

**THE PARTIES**

5. 11T Partners is a limited liability corporation organized and existing under the laws of the State of New York, with a principal place of business located at 420 Lexington Avenue, Suite 2440, New York, New York 10170.

6. CritiTech is a corporation organized and existing under the laws of the State of Kansas, with a principal place of business located at 1849 East 1450 Road, Lawrence, Kansas 66044.

**FACTUAL ALLEGATIONS**

**11TPartners and Its Investment Banking Services**

7. 11T Partners is a small, private investment banking firm that specializes in the healthcare market.

8. 11T Partners, through its members and employees, has over thirty (30) years of experience in the healthcare industry.

9. 11T Partners provides its clients with, *inter alia*, the following services: advice on mergers and acquisitions, divestitures, private placements, financial advice, private market financing, product licensing, partnering and valuation and fairness opinions.

**CritiTech, Its Business and Nanotax®**

10. CritiTech is a company that develops drugs and assists other companies with developing and manufacturing their own drugs, as well as medical devices, for use in both humans and animals.

11. CritiTech owns, amongst other assets, the rights to a drug called Nanotax®. Nanotax® is a cancer treatment drug for use in humans that is allegedly protected by U.S. Patent No. 8,221,779 B2 as well as a federal trademark registration.

12. CritiTech also allegedly owns proprietary technology, covered by patents, trademarks and trade secrets, which enables it to manufacture Nanotax® and other drugs.

13. In 2013, Nanotax® was in development for use in humans, and needed further testing in accordance with the regulations of the United States Food and Drug Administration ("FDA"). Specifically, Nanotax® had completed what is known in the industry as a Phase I clinical study. However, CritiTech needed additional funding to continue the drug's development in order to submit a New Drug Application ("NDA") to the FDA so that it could be used in the United States for cancer treatment in humans.

**CritiTech and 11T Partners' Service Agreement**

14. In November 2013, one of 11T's former clients connected CritiTech with 11T Partners to assist CritiTech with facilitating a transaction around Nanotax®. Specifically, CritiTech wanted 11T Partners to help it find a buyer, partner or licensee to invest in, or to acquire the rights to Nanotax® in order to continue the development process and bring it to market.

15. After substantial negotiations, on January 6, 2014, CritiTech and 11T Partners entered into a written agreement, pursuant to which CritiTech retained 11T Partners to

provide it with financial advisory services in connection with its disposition of Nanotax® (the "Letter Agreement").

16.   Under the terms of the Letter Agreement, 11T was retained to act as CritiTech's financial advisor and investment banker in an effort to locate the purchaser of, and effect the sale, licensing, co-development, joint-venture, business combination or other disposition of operations, intellectual property, trade-secrets and/or assets (collectively [defined in the Letter Agreement as] a **'Transaction'**) of Nanotax®  (emphasis added).  Accordingly, 11T Partners was given the right, but not the obligation, to act as the finder and/or facilitator of any Transaction involving Nanotax®.

17.   The specific services with which 11T Partners was to provide CritiTech are:

A.    Familiarize itself with the Business by requesting and obtaining information and conducting due diligence;

B.    Prepare and produce marketing materials describing the operations and/or assets to be sold to potential buyers for the express purpose of consummating a Transaction;

C.    Prepare and review with the Company a list of potential buyers to be contacted by 11T in connection with the Transaction and contact any such Buyers on the Company's behalf and/or provide materials to them, subject in each case to the prior consent of the Company;

D.    Use its best efforts to identify and/or locate prospective Buyers and counsel the Company as to strategy and tactics for initiating introductions and discussions with, and negotiating with, prospective Buyers;

E.    Use its best efforts to consult with and advise the Company as to the aspects of any proposed Transaction including selling price, terms and conditions and deal structure;

    F.    Assuming an agreement in principle is reached for a Transaction, 11T will assist the Company in negotiating a definitive agreement in collaboration with the Company's counsel and other advisors; and

    G.    Perform such other financial advisory services as 11T and the Company may from time to time agree upon.

    18.    The term of the Letter Agreement began on January 6, 2014 and will end on December 31, 2015.  The exclusive term of 11T Partners' engagement ended on December 31, 2014.  Although CritiTech had the sole and absolute right to accept or reject an offer received from a prospective purchaser, all fees due 11TPartners under the Letter Agreement were payable upon any Transaction consummated on or before December 31, 2015.

    19.    Under the Letter Agreement, 11T was entitled to (and was paid) an "Advisory Fee", which was paid in installments over six months.

    20.    11T Partners was also entitled to a "Contingent Fee" under the Letter Agreement equal to: (a) 5% of Aggregate Consideration (defined below) from $0 to $2,000,000.00, plus; (b) 4% of Aggregate Consideration from $2,000,000.00 to $4,000,000.00; plus (c) 3% of Aggregate Consideration from $4,000,000.00 to $6,000,000.00; plus (d) 2.5% of Aggregate Consideration above $6,000,000.00.  In no event, however, was the Contingent Fee, due on the closing of any Transaction, to be less than $300,000.00 (the "Minimum Contingent Fee").

    21.    "Aggregate Consideration" is defined in the Letter Agreement as "the total amount of cash and the fair market value on the date immediately prior consummation of the Transaction (the "Valuation Date") of all other property paid or payable directly or indirectly to the Company or any of its stockholders in connection with the Transaction . . . and shall also be deemed to include (1) in the case of a joint venture, the total amount of cash and fair market

value on the Valuation Date of all other property contributed by the Company to the Buyer or to the joint venture, and (2) in the case where the Transaction includes the Business and other Company assets, all assets or equity purchased or licensed in such Transaction."

22. Apart from the exclusivity period, which expired on December 31, 2014, 11T Partners specifically included what is known in the investment banking industry as a "tail period" in connection with any Transaction involving Nanotax®. This tail period, which does not expire until December 31, 2015, specifies that if CritiTech consummates a Transaction vis-a-vis Nanotax® on or before December 31, 2015, 11T Partners is not only entitled to its Minimum Contingent Fee, but also its Contingent Fee.

23. 11T Partners' entitlement to these monies is absolute and irrespective of whether CritiTech or 11TPartners locates the ultimate purchaser of Nanotax® or otherwise assists with the disposition of its assets. The reason for the tail period is simple: given that 11T Partners was investing twelve months (or more) of work to facilitate CritTech's disposition of Nanotax®, CritiTech was receiving valuable services in connection with such disposition, regardless of whether 11T Partners was, ultimately, the finder of Nanotax®'s purchaser, funder or licensee.

24. There was only one caveat to the fees owed 11T Partners under the Letter Agreement and that was a Transaction with a specific third party company.

25. In late 2013 and early 2014, when 11T Partners was negotiating the Letter Agreement with CritiTech, 11T Partners learned that CritiTech had already had discussions with a third party regarding Nanotax®. In an effort to acknowledge and not to profit from CritiTech's previous efforts to negotiate a deal with that third party, 11T Partners offered to discount its fees by fifty (50) percent should CritiTech, ultimately, consummate a Transaction with that particular party on or before December 31, 2014. On information and belief, no such transaction occurred.

26.     The Letter Agreement is in effect through December 31, 2015, unless terminated in writing by CritiTech, its stockholders and affiliates.  To date, however, 11T Partners has never received notice, written or otherwise, of any such termination.  Regardless, pursuant to the terms of the Letter Agreement, a termination of 11T Partners' engagement does not affect CritiTech's obligations to tender payment to 11T Partners for any consummated Transaction involving Nanotax® during the exclusive period and/or prior to the expiration of twelve (12) months following termination of the exclusive engagement period.

27.     Finally, the Letter Agreement specifies that it is governed by and shall be construed in accordance with the laws of the State of New York and that any action to enforce it must be brought in the Southern District of New York.

**The Services 11T Partners Rendered to CritiTech**

28.      In January 2014, 11T Partners began rendering investment banking services to CritiTech in connection with its disposition of Nanotax®.

29.     In January 2014, Rusty Ray,[1] a principal of 11T Partners and Christian Carlson,[2] an associate, traveled to Lawrence, Kansas, to meet with the principals at CritiTech, familiarize themselves with CritiTech's business and to explore the scope of the project.  The parties met over a period of two (2) days and discussed various strategies with which to dispose of Nanotax® and the business associated with it.

30.     When Mr. Ray and Dr. Carlson returned to New York, they consulted with experts and researched secondary sources (such as publications and online sources) to determine what regulatory path would be required to bring Nanotax® to market as well as what the

---

[1] Mr. Ray has a M.B.A. from Fordham University.

potential monetary value of such a deal might be. Analyzing different FDA regulatory paths was critical to 11T Partner's evaluation and development of different types of acquisitions and deal structures because the different regulatory paths would affect who the acquirer was as well as the cost and timing of the drug's development.

31. Over several months, 11T Partners performed a valuation of Nanotax®, which included pricing, development costs, manufacturing costs, revenue potential and, ultimately, profitability. This valuation was presented to CritiTech in the form of a PowerPoint presentation, which became a frequent agenda item during the parties' weekly teleconferences.

32. 11T Partners invested a substantial amount of time in identifying the universe of potential acquirers, partners, joint ventures and licensees. 11T Partners' ultimate target list identified numerous potential targets for the Nanotax® deal both in the United States and abroad.

33. In terms of other work product, 11T Partners created a five (5) page non-confidential summary (called a "blinded teaser"), which summarized Nanotax®'s assets. The blinded teaser was designed to assist a potential target with deciding whether to explore such an opportunity further and, if so, enter into a non-disclosure agreement ("NDA").

34. 11T Partners also drafted a confidential information memorandum, which is a thirty-three (33) page document that thoroughly analyzes Nanotax®'s assets as well as its potential market.

35. The non-confidential memorandum, the confidential memo and the target list were all reviewed, approved and authorized by CritiTech before they were disseminated or used by 11T Partners to contact the potential targets.

---

[2] Dr. Carlson possesses a PhD in physiology from the University of Texas Health Science Center Houston, Graduate School of Biomedical Sciences and an M.B.A. from New York University's Stern School of Business.

36. During the period from January through November, 2014, 11T Partners and CritiTech had weekly and, sometimes multiple, calls to discuss the Nanotax® deal. 11T Partners also sent CritiTech written weekly updates about the progress being made with the potential targets.

37. Over the course of eleven (11) months, 11T Partners contacted numerous potential targets. Of those targets, about half requested the blinded teaser and some of the potential targets executed NDAs and received the confidential memorandum.

38. 11T Partners set up calls between it, CritiTech and the potential targets, who executed the NDAs, to discuss a potential transaction involving Nanotax®. In fact, some of those targets actually traveled to Lawrence, Kansas to do a site evaluation, meet with CritiTech's principals, evaluate a potential transaction involving Nanotax® and conduct initial due diligence.

39. On September 23, 2014, 11T Partners sent out a final request for a non-binding indication of interest to some of those companies who had signed the NDA. In the end, however, none of the targets moved forward with a transaction.

**The Nanotax® Transaction**

40. Upon information and belief, in June of 2014, CritiTech began speaking with an individual about a potential deal for Nanotax®.

41. In July of 2014, CritiTech began sending 11T Partners terms sheets reflecting a deal with this particular individual and asked 11T Partners to evaluate the proposed transaction based upon 11T Partners' general knowledge of other pharmaceutical transactions as well as the research it had conducted on Nanotax®.

42. Using one of the financial models 11T Partners developed for Nanotax® and 11T Partners' valuation of its assets, 11T Partners ultimately concluded that the proposed deal with the individual was satisfactory and would sufficiently protect CritiTech from any down-side risk.

43. From August 2014 through May 2015, 11T Partners repeatedly offered to assist CritiTech with finalizing a deal with this particular individual.  However, CritiTech declined 11T Partners' offers.

44. Upon information and belief, on June 15, 2015, in a deal involving the individual, two companies, DFB-Nano, LLC ("DFB Nano") and Nanology LLC ("Nanology") and CritiTech, the Parties entered into an agreement, pursuant to which they created a third party joint venture company.

45. Upon further information and belief, CritiTech entered into a transaction involving Nanotax®.  As a result of such transaction, it is believed that one or more of the following entities currently owns and/or has rights to the Nanotax® assets:  DFB-Nano, Nanology Holdings, LLC or NanOlogy, LLC.

46. Based on 11T Partners' calculations, on the Valuation Date, the Transaction (as defined in the Letter Agreement) involving Nanotax® is highly valued.  On information and belief, accordingly, based on the Letter Agreement, the fees owed 11T Partners is in excess of three million dollars and payable to 11T Partners when equity or cash consideration is received.

47. Shortly after the closing, the parties discussed payment of 11T Partners' fees under the Letter Agreement.  However, it became immediately apparent to 11T Partners that CritiTech had no intention of honoring the terms of the Letter.

48. On July 7, 2015, Hazelton & Laner, (the attorneys representing CritiTech), sent 11T Partners a letter, informing them that CritiTech would not pay 11T Partners any fee.

49. To date, 11T Partners has not received any Contingent Fee despite the fact that 11T Partners duly completed all of its obligations under the Letter Agreement, the Letter Agreement was in effect as of the time of the Transaction and 11T made a timely demand for payment for its services.

**COUNT ONE**
**(Breach of Contract)**

50. 11T Partners repeats and realleges each and every allegation contained in paragraphs 1 - 49 of this Complaint with the same force and effect as if fully set forth herein.

51. 11T Partners and CritiTech entered into an arm's length Letter Agreement, which was memorialized in writing.

52. The Letter Agreement was supported by mutual consideration and properly executed.

53. Pursuant to the terms of the Letter Agreement, CritiTech agreed to promptly pay 11T Partners a Contingent Fee equal to: (a) 5% of Aggregate Consideration from $0.00 to $2,000,000.00, plus; (b) 4% of Aggregate Consideration from $2,000,000.00 to $4,000,000.00; plus (c) 3% of Aggregate Consideration from $4,000,000.00 to $6,000,000.00; plus (d) 2.5% of Aggregate Consideration above $6,000,000.00 in connection with 11T Partners' investment banking services.  In no event, however, was the Contingent Fee to be less than $300,000.00, which was due upon the Transaction's closing.

54. Upon information and belief, the Transaction closed on June 15, 2015.

55. 11T Partners performed under the terms of the Letter Agreement and provided CritiTech with investment banking services in conformity with and well beyond the terms set forth in the Letter Agreement.

56. As a result of the Transaction's completion and 11T Partners' efforts under the Letter Agreement, CritiTech owes 11T Partners a Contingent Fee in excess of three million dollars.

57. 11T Partners made a timely demand for payment.

58. CritiTech has failed and refuses to pay 11T Partners any of the monies due and owing under the Letter Agreement. Accordingly, CritiTech breached its obligation to pay 11T Partners under the terms of the Letter Agreement.

59. As a direct result of this breach of contract, 11T Partners has suffered damages in excess of three million dollars.

## COUNT TWO
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

60. 11T Partners repeats and realleges each and every allegation contained in paragraphs 1 - 59 of this Complaint with the same force and effect as if fully set forth herein.

61. Implied within every contract, including the Letter Agreement in this matter, is the covenant of good faith and fair dealing.

62. CritiTech materially breached and/or violated its obligation and duty of good faith and fair dealing as a result of the conduct described above.

63. As a result of CritiTech's breach of the implied covenant of good faith and fair dealing, 11T Partners has been damaged in excess of three million dollars.

## COUNT THREE
### (Quantum Meruit)

64. 11T Partners repeats and realleges each and every allegation contained in paragraphs 1 - 63 of this Complaint with the same force and effect as if fully set forth herein.

65. In reliance on CritiTech's promises, 11T Partners performed valuable services for CritiTech with a reasonable expectation of payment.

66. CritiTech knowingly allowed 11T Partners to perform its services without objection and knowingly benefitted from and enjoyed such services.

67. CritiTech knew that 11T Partners expected to be paid for the services it provided.

68. CritiTech has not compensated 11T Partners for the fair market value of the services 11T Partners provided.  As a result, 11T Partners has been damaged in an amount in excess of three million dollars.

## COUNT FOUR
### (Unjust Enrichment)

69. 11T Partners repeats and realleges each and every allegation contained in paragraphs 1 - 68 of this Complaint with the same force and effect as if fully set forth

70. 11T Partners provided CritiTech with valuable services.

71. CritiTech knew of the benefits it was receiving and accepted and enjoyed the benefits of 11T Partners' services.

72. CritiTech has been unjustly enriched by its refusal and failure to pay 11T Partners for the full value of 11T Partners' services.  As a result, 11T Partners has been damaged in an amount in excess of three million dollars.

## PRAYER FOR RELIEF

WHEREFORE, 11T Partners prays for relief as follows:

(a) Compensatory damages in an amount to be set at trial, but not less than three million dollars, with interest thereon from the date said monies became and/or become due;

(b) Costs and disbursements of this action;

(c)     11T Partner's reasonable attorney's fees and expenses incurred in the prosecution of this action; and

(d)     Any such other and further relief as the Court deems just, fair and proper.

Dated:   New York, New York
         July 21, 2015

Respectfully submitted,

By: */s/ Lora A. Moffatt*
Lora A. Moffatt
CROWELL & MORING LLP
590 Madison Avenue
New York, New York 10022
Tel: (212) 223-4000
Fax: (212) 223-4134
lmoffatt@crowell.com

*Counsel for 11T Partners, LLC*

-14-